**AFFIRMED and Opinion Filed November 19, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-18-00434-CV
_____

**TARGET STRIKE, INC., Appellant**
**V.**
**STRASBURGER & PRICE, L.L.P.; DANIEL LANFEAR; DONATO RAMOS;**
**ALFREDO RAMOS; AND THE LAW OFFICE OF DONATO D. RAMOS, PLLC,**
**Appellees**

On Appeal from the 193rd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-14-06568

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Bridges

This appeal concerns appellant Target Strike, Inc.'s (TSI) legal malpractice claim against appellees' Strasburger & Price, L.L.P., Daniel Lanfear, Donato Ramos, Alfredo Ramos, and the Law Offices of Donato D. Ramos, PLLC. Appellees represented TSI in its original, underlying federal lawsuit involving causes of actions for misuse of its confidential information in the locating and staking of mining claims in Nevada. TSI's claims were defeated based on statutes of limitations grounds. TSI then filed suit for legal malpractice against appellees for their handling of the federal case. Appellees filed traditional motions for summary judgment. The trial court sustained appellees' objections to TSI's summary judgment evidence and granted appellees' summary judgment motions.

On appeal, TSI argues genuine issues of material fact exist as to whether (1) but for appellees' negligence, TSI's claims in the underlying case would have survived limitations such that the negligence of the lawyers was the proximate cause of TSI's injuries; and (2) but for the negligence of appellees in not asserting TSI's claims in Nevada, where there is a longer statute of limitations, its claims in the underlying case would have survived limitations. TSI also contends a genuine issue of material fact exists from which a jury could have determined the lawyers entered into attorney-client relationships with TSI before limitations expired on its underlying claims and failed to take appropriate steps to protect TSI's interests. Finally, TSI challenges the trial court's rulings on its summary judgment evidence. We affirm the trial court's judgment.

## Background

TSI owns proprietary technology that it used in the 1990s to analyze publicly available data and identify "target areas" or "anomalies" on federal land in Nevada with a high potential for the mining of gold and other precious metals. On December 12, 1996, TSI entered into a contract with Marston Environmental, Inc. (MEI) to perform field work in the targeted areas. MEI and TSI were both Texas corporations with their principal place of business in San Antonio, Texas. The contract contained a confidentiality agreement requiring MEI to "keep all information secured in connection with or generated as a result of performing the Services in strict confidence." The contract also contained a "GOVERNING LAW" provision stating, "This Contract shall be interpreted, construed, and governed by the laws of the State of Texas. The parties hereby submit to the jurisdiction of courts located in, and venue is hereby stipulated in, Bexar County, Texas."

Six months later, TSI formed a joint venture named Gold Resources Nevada L.L.C. to explore other target areas. Gold Resources entered into a contract with MEI that contained identical confidentiality and governing law provisions as the contract between TSI and MEI. Part

of MEI's work included a project called Double Mountain. William Shaffer worked as an independent contractor on the Double Mountain project.[1]

During a presentation on January 28, 2002, MEI allegedly disclosed TSI's purportedly confidential information in violation of the confidentiality provisions to Crandall Addington and Lou B. Kost.[2] Addington and Kost later formed Gold Reef of Nevada, Inc., which later became Gold Reef International, Inc., and hired MEI to do field work.

In 2005, Shaffer began physically staking certain mining claims, some of which were in areas that "either overlapped or were near target areas" identified by TSI and that had been the subject of TSI's contracts with MEI. Shaffer recorded the staked claims with the Bureau of Land Management (BLM) in August of 2005 and subsequently recorded others in September and October of 2005. Shaffer staked the claims in his own name.

In the summer of 2007, Alex Weinberg, TSI's president, began investigating the areas where Gold Reef had staked mining claims and realized they closely correlated to those anomalies identified by TSI's software that had been shared with MEI. He became even more suspicious in February of 2008 when he read an article in the San Antonio Business Journal discussing Gold Reef's idea to "take the guesswork out of precious metals exploration." By the summer of 2009, Weinberg believed Shaffer, as Gold Reef's agent, had staked claims dating back to 2005.

On July 7, 2009, Weinberg met with Daniel Lanfear, a partner at Strasburger & Price, LLP, and discussed his concerns. Lanfear met with Weinberg several more times over the next few months. Lanfear also reached out to other attorneys who might be interested in sharing the upfront costs of litigation. On December 2, 2009, Donato Ramos attended an initial meeting with Lanfear and Weinberg. The parties continued to meet and discuss the case; however, the attorneys and TSI

---

[1] Shaffer "had previously been engaged by Target Strike, Gold Resources, or both." *See Target Strike, Inc. v. Marston & Marston, Inc*., 524 Fed. Appx. 939, 941 n.3 (5th Cir. 2013).

[2] These disclosures were the basis for all the claims in the underlying federal lawsuit.

disagree on when an attorney-client relationship began. TSI believed an implied relationship existed as early as July of 2009. The attorneys believed the attorney-client relationship began when the parties signed a contingency fee agreement on January 27, 2010.

On February 10, 2010, TSI filed suit in state court for misappropriation of trade secrets and other state law claims. Shortly thereafter, the case was removed to federal court. The federal district court granted summary judgments in favor of all defendants and determined in part that there was no evidence the defendants misappropriated or participated in a scheme to misappropriate TSI's trade secrets and that TSI's claims were barred by the statutes of limitations. TSI appealed to the Fifth Circuit.

The Fifth Circuit determined the longest applicable statute of limitations for any of TSI's claims was four years. *Target Strike, Inc. v. Marston & Marston, Inc.*, 524 Fed. Appx. 939, 944 (5th Cir. 2013). "The complained of acts occurred, at the very latest, when Shaffer recorded five mining claims near Target Strike's target area in August 2005" but suit was not filed until February 10, 2010. *Id*. In its analysis, the court considered application of the discovery rule for misappropriation of trade secrets. *Id*. (citing TEX. CIV. PRAC. & REM. CODE ANN. 16.010(a)). It discussed *HECI Exploration v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) in which the Texas Supreme Court concluded landowners "had some obligation to exercise reasonable diligence in protecting their interests" and "cannot be oblivious to the existence of other operators in the area." *Target Strike, Inc*. 524 Fed. Appx. at 944–45 (quoting *HECI*). The duty of reasonable diligence extended to monitoring one's own property, monitoring adjacent property, making general inquiries to knowledgeable parties, and inspecting publicly available records that would disclose facts giving rise to the cause of action. *Id*. at 945. The Fifth Circuit agreed summary judgment on limitations grounds was appropriate because TSI had reason to be alerted of a potential claim when

–4–

Shaffer staked the property and "had every reason to monitor diligently" such claims. *Id*. The court concluded

> Target strike could have monitored its target areas by physically visiting the areas to look for claim stakes, by going to the relevant county courthouses to view cla[i]m records and maps, by searching on the Bureau of Land Management website or SEDAR, or by hiring someone to monitor the target areas for claims. Had Target Strike done so, it would have known well within the applicable statute of limitations that claims had been staked near five of its target areas and it could have timely investigated whether a misappropriation of its confidential information had occurred.

*Id*. Because limitations applied to each defendant and each defendant raised the defense before the district court, the Fifth Circuit affirmed. *Id*. at 946.

TSI initiated the legal malpractice suit that is the subject of this appeal in June of 2014. TSI argued the lawyers failed to (1) file the underlying case within the statutes of limitations, (2) remand the case back to state court, (3) bring additional claims against the underlying defendants, and (4) file the underlying case in Nevada. The Strasburger and Ramos attorneys filed motions for summary judgment arguing (1) limitations ran on TSI's causes of actions before their involvement in the case, (2) failure to seek a remand to state court did not prejudice TSI because the federal court correctly applied state law and the applicability of the discovery rule, and (3) filing suit in Nevada would not have resulted in a different outcome. TSI filed its response and attached evidence. The attorneys objected to certain evidence. The trial court sustained the attorneys' objections to TSI's summary judgment evidence and granted their motions for summary judgment. This appeal followed.

## Objections to Summary Judgment Evidence

In its third issue, TSI argues the trial court abused its discretion by sustaining Strasburger's and Ramos's objections to its summary judgment evidence. Because the trial court's rulings impact the evidence we may consider on appeal, we address this issue first.

We review a trial court's ruling sustaining an objection to summary judgment evidence for an abuse of discretion. *Beinar v. Deegan*, 432 S.W.3d 398, 402 (Tex. App.—Dallas 2014, no pet.). A trial court abuses its discretion if it acts arbitrarily and unreasonably. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

The trial court's order stated "objections to Plaintiff's summary-judgment evidence are sustained, and the portions of Plaintiff's evidence that are the subject of the objections are not considered as competent summary-judgment evidence." TSI has not provided any argument as to why the trial court's ruling was in error. Rather, TSI contends the order sustains only those objections urged by appellees and "presumably, the ruling . . . did not preclude consideration of the objected-to portions of the affidavits for non-objectionable purposes." We decline to read the order so narrowly, but instead conclude the order excluded the objected-to evidence for all purposes.

To the extent TSI argues such a broad reading of the order constitutes reversible error, TSI has failed to preserve its argument for review. A claim of error on appeal must be argued in the party's brief. *See AT&T Corp. v. Sw. Bell Tel. Co.*, No. 05-99-00186-CV, 2000 WL 14711, at *7 (Tex. App.—Dallas Jan. 11, 2000, no pet.). It is insufficient simply to refer the appellate court to the party's trial court arguments made in response to a motion for summary judgment. *Id.* (limiting review of objections to summary judgment evidence to those argued in the brief and not simply those cited to clerk's record); *see also Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 325 (Tex. App.—Fort Worth 2007, pet. denied). "Were we to approve of this tactic, appellate briefs would be reduced to simple appellate record reference to a party's trial court arguments." *Guerrero v. Tarrant Cnty. Mortician Servs. Co.*, 977 S.W.2d 829, 832 (Tex. App.—Fort Worth 1998, pet. denied). Here, TSI states, "The contested statements were admissible for all purposes, as was shown in great detail in the trial court" and cites to the clerk's record. This is insufficient;

therefore, TSI has not presented its arguments for review, and we overrule its third issue. As such, we will consider the evidence appellees presented in support of their motions for summary judgment and the unobjected-to evidence TSI presented in its summary judgment response to determine whether summary judgment was appropriate.

**Discussion**

We review the trial court's traditional summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Under rule 166a(c), the moving party must show no genuine issue of material fact exists, and it is entitled to judgment as a matter of law. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). In reviewing a summary judgment, we consider the evidence in the light most favorable to the non-movant and resolve any doubt in the non-movant's favor. *Id*. Because the trial court's order granting summary judgment does not specify the basis for the ruling, we must affirm the trial court's judgment if any of the theories advanced are meritorious. *Id*.

To prevail on a legal malpractice claim, the plaintiff must prove the defendant owed the plaintiff a duty, the defendant breached that duty, the breach proximately caused the plaintiff's injury, and the plaintiff suffered damages. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp*., 299 S.W.3d 106, 112 (Tex. 2009). If a legal malpractice case arises from prior litigation, a plaintiff must prove that, but for the attorney's breach of his duty, the plaintiff would have prevailed in the underlying case. *Grider v. Mike O'Brien, P.C*., 260 S.W.3d 49, 55 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Cases often refer to this causation aspect of the plaintiff's burden as the "suit-within-a-suit" requirement. *Id*.

Summary judgment may be proper if it is shown that the attorney's act or omission was not the cause of any damages to the client. *Rodgers v. Weatherspoon*, 141 S.W.3d 342, 345 (Tex. App.—Dallas 2004, no pet.).

Here, TSI argues fact issues exist as to when its claims accrued, and but for the lawyers negligence by (1) failing to present evidence demonstrating why it was unreasonable to trigger limitations on the date Shaffer staked/recorded his first claims rather than a later date, (2) failing to assert other claims, and (3) failing to file suit in Nevada, its claims could have survived limitations. Thus, TSI contends the Fifth Circuit determined an incorrect accrual date for limitations because it relied on incorrect arguments and evidence presented (and not presented) by the attorneys. Strasburger and Ramos respond the statutes of limitations had run on TSI's causes of action before an attorney-client relationship existed; therefore, they did not owe any duty to TSI and could not have caused TSI's damages in the underlying federal suit. Further, they argue none of their alleged acts or omissions would have changed the outcome of the underlying case.

The first question in a legal malpractice claim is whether an attorney-client relationship exists because an attorney only owes a duty to his or her client. *Border Demolition & Envtl., Inc. v. Pineda*, 535 S.W.3d 140, 152 (Tex. App.—El Paso 2017, no pet.). Thus, we first determine if appellees established as a matter of law that TSI's original causes of action were barred by limitations before TSI became their client. In doing so, we must ascertain when an attorney-client relationship was established between the parties. TSI argues the creation of an attorney-client relationship was not exclusively dependent on the January 27, 2010 execution of the formal retention agreement; rather, appellees' conduct created an implied relationship months before the contract was signed. Appellees respond the signed contract created the relationship. Alternatively, they assert they had no duty to provide legal advice to a prospective client during preliminary consultations, and Weinberg's subjective belief that an attorney-client relationship existed is insufficient to create a fact issue.

While an attorney-client relationship is usually created through an express contract, the relationship can be implied from the parties' conduct indicating an intent to enter into such a

relationship. *Id*. Whether the agreement is express or implied, there must be evidence *both* parties intended to create an attorney-client relationship. *Kiger v. Balestri*, 376 S.W.3d 287, 290 (Tex. App.—Dallas 2012, pet. denied). One party's subjective belief is insufficient to raise a question of fact to defeat summary judgment. *Id*. Thus, evidence that a client harbored a mistaken belief of a formed relationship is insufficient, standing alone, to establish that the attorney had a duty to represent the client. *Pineda*, 535 S.W.3d at 152.

Attorney duties are not, however, limited to representing a client in a lawsuit and under certain circumstances, an attorney has a duty to inform a client, or even a putative client, that he or she will not be representing it in litigation, and to instruct the putative client to take alternate action to protect its interests. *Id*. Generally, duties owed by an attorney only arise in cases in which the evidence supports a finding that an attorney knew or should have known that his or her conduct would have led a reasonable person to believe the attorney was providing representation in a matter. *Id*. at 153. If the record contains evidence of circumstances that would have led a person to believe that an attorney had agreed to undertake representation, a fact question is raised on the issue, and summary judgment is inappropriate. *Id*. However, if the record does not contain evidence from which a jury could conclude that an attorney had reason to know that the plaintiff was relying on him to provide legal services, the court may determine, as a matter of law, that the attorney owed no duty, and the court may grant summary judgment in the attorney's favor. *Id*. With these principles in mind, we consider when an attorney-client relationship existed between TSI and Strasburger and Ramos.

We begin with Strasburger and review the evidence presented to the trial court regarding the actions between Weinberg (on behalf of TSI) and Lanfear (on behalf of Strasburger). It is undisputed the parties did not sign the fee agreement until January 27, 2010. However, the initial meeting between Weinberg and Lanfear occurred on July 7, 2009. In that meeting, Weinberg

provided Lanfear with numerous documents, including technical reports concerning Shaffer's 2005 staking of claims on behalf of Gold Reef. According to Weinberg, Lanfear "promised to read through this information and meet with [him] again in the near future."

The two met again on July 16, 2009. Lanfear told Weinberg he had studied the materials, was interested in the case, and was investigating the merits.

During a July 22, 2009 meeting, Lanfear informed Weinberg that Strasburger wanted to find another law firm to partner and assist with the upfront litigation costs of representation. According to Weinberg's affidavit:

> [Lanfear] told me that in the coming days and weeks he would be approaching various firms, discussing Target Strike's claims, and sharing with them the information detailing these claims that Target Strike had provided him and Strasburger. I asked Lanfear what Strasburger would do if it could find no partner to share costs. Lanfear indicated that such an eventuality would not stop Strasburger from moving Target Strike's case forward. Lanfear therefore, *by word and by conduct, represented to me that he and his firm were Target Strike's attorney* and were working diligently on Target Strike's case.

[Emphasis added.]

On August 31, 2009, Lanfear drafted a memorandum to "File" intended "to outline the basic facts and general legal theories that pertain to the referenced parties and Target Strike, Inc.'s (TSI) apparent causes of action related to proprietary information . . . ." The memorandum does not reference TSI as a client.

Another memorandum, dated December 7, 2009, to Strasburger's policy committee, begins by "requesting permission to represent Target Strike, Inc. under a pure contingent fee agreement." Although the document refers to TSI as "client" several times, Lanfear explained during his deposition, "clearly what's happening here is I'm requesting permission to form the attorney/client relationship . . . Target Strike was not our client at this point in time on December 7, 2009." He explained "the whole point of this memo was to get permission of the law firm to take on the

–10–

representation." Further, the memorandum was internal and not shared with TSI until produced in discovery after the filing of the malpractice suit. The memorandum ended with, "I am hoping to get an answer from you as soon as possible. There is a statute of limitations issue that makes it essential that we get the lawsuit filed in January of 2010." Attached to the memorandum was a contingency fee evaluation checklist.

A December 29, 2009 memorandum from Lanfear to Strasburger's policy committee answered questions raised by the committee regarding "our representation" of TSI. One particular issue raised: "What ethical considerations are there if the firm limits its representation to a set number of hours and a fixed amount of out-of-pocket expenses and, after the exhaustion of those limits, withdraws as TSI's counsel?" As part of the answer, Lanfear explained "the fee agreement that we plan to enter with TSI provides" certain steps for withdrawal in compliance with the Code of Professional Responsibility. It also stated, "Please let me know if there are any other questions that the Policy Committee would like answers to *prior to our beginning to represent TSI*." [Emphasis added]

On January 8, 2010, Lanfear sent an email attaching a proposed fee agreement. He emphasized getting the agreement signed so he could focus on the litigation because he "cannot even open a file until the agreement is executed." Weinberg revised the draft and returned it via email on January 10, 2010. Lanfear questioned the revisions in a response email on January 11, 2010 and further stated that Weinberg was "making this very difficult, and I am reconsidering whether representing you is worth it."

A January 18, 2010, email from Lanfear to Weinberg and others asked Weinberg to direct any questions or concerns about the fee agreement to Ramos because "[w]e need to either get the agreement in place or make it clear that Target Strike will look elsewhere for representation. As you know, neither Strasburger & Price nor the Law Offices of Donato Ramos currently represents

Target Strike." Lanfear denied that "we need to make it clear" indicated it previously had not been clear as to whether TSI was its client. Rather, he was trying to "shore up an attorney/client relationship" and that "wouldn't happen until we had a fee agreement in place."

Having reviewed the evidence presented to the trial court, we conclude TSI failed to provide any specific statements or actions by Lanfear from which an attorney-client relationship could be implied. Weinberg's statement that Lanfear represented "by word and by conduct" that Strasburger represented TSI was his subjective belief about the existence of an attorney-client relationship. However, the record does not support "some manifestation that both parties intended to create an attorney-client relationship." *See Valls*, 314 S.W.3d at 634. To the contrary, Strasburger's emails and memoranda as detailed above consistently show TSI was not Strasburger's client until the fee agreement was signed. *Id.* ("the entire appellate record contains no request by Valls, or an agreement by the Lawyers, to represent him at any time"). *Cf. Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex. App.—Corpus Christi 1991, writ denied) (fact issue existed where attorneys allegedly stated they were Perez's lawyers and "were going to help him").

In reaching this conclusion, we are mindful that three Strasburger billing entries from October 6, 2009, October 14, 2009, and November 2, 2009 referred to TSI as "client" and "clients." However, the remaining billing entries from October 6, 2009 to December 15, 2009 that TSI submitted in response to Strasburger's summary judgment refer to "Target Strike," "Target Strike case," or the "Target Strike matter." Such passing references to "client" under the facts of this case do not raise an issue of fact about whether there was an intent to create an attorney-client relationship. *See, e.g., Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding time records referring to "client" instead of "prospective client" was one consideration in determining attorney-client relationship was not established before fee agreement signed).

–12–

We acknowledge that some courts have concluded that when an attorney's actions suggest he is assisting with a legal matter or the attorney makes promises that he will assist in the future, such evidence is sufficient to raise a question of fact regarding an implied agreement. *See Perez*, 822 S.W.2d at 265; *see also Saulsberry v. Ross*, 485 S.W.3d 35, 44–45 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (finding sufficient evidence that attorney-client relationship existed on post-judgment action where attorney had represented plaintiff in the same lawsuit prior to judgment, had spoken to opposing counsel on plaintiff's behalf regarding post-judgment issues, and had provided advice to plaintiff on post-judgment issues). However, in such cases, it is often the pre-existing attorney-client relationship that tips the scales. *See Pineda*, 535 S.W.3d at 154 (fact issue as to whether attorney knew or should have known that plaintiff relied on him for representation or advise based on existence of continuing relationship); *Saulsberry*, 485 S.W.3d at 44; *Perez*, 822 S.W.2d at 265.

TSI and Strasburger did not have a previous attorney-client relationship. The three preliminary meetings in July between the parties indicate Strasburger was gathering facts and investigating potential causes of action. Lanfear's expressed interest in the case, his "shopping" the case to other attorneys to share litigation cost, and his statement that Strasburger would move forward on the case if they could not share the costs with another firm is not evidence creating a genuine issue of material fact regarding the existence of a fiduciary relationship or an implied attorney-client relationship. To the extent TSI relies on *Nolan v. Foreman*, 665 F.2d 738, 739 n.3 (5th Cir. 1982) for the proposition that a "fiduciary relationship between an attorney and his client extends even to preliminary consultations between the client and the attorney regarding the attorney's possible retention," we find the case distinguishable. In that case, the court considered the proper standard for evaluating a fee agreement and not whether a fiduciary duty existed between the lawyer and client. *Id*. at 739. Further, the court recognized, "All that is required under

–13–

Texas law is that the parties, explicitly or by their conduct, manifest an intention to create the attorney/client relationship." *Id*. at 739 n.3. As explained, the evidence does not raise a fact issue about whether *both* parties intended to enter an attorney-client relationship.

Further, although a fiduciary relationship exists between an attorney and client as a matter of law, "an attorney-client relationship must exist before a fiduciary duty arises." *Neese v. Lyon*, 479 S.W.3d 368, 387 (Tex. App.—Dallas 2015, no pet.); *Kiger*, 376 S.W.3d 290. The facts here do not indicate such a duty arose based on the parties' preliminary discussions prior to signing the fee agreement.

Finally, TSI relies on Weinberg's testimony that "Lanfear also never told me at these meetings that he was not acting as my attorney." While an attorney may be held negligent for failing to advise the party of the attorney's non-representation if circumstances lead a party to believe that it is represented, "the question is whether the attorney was aware or should have been aware that his conduct would lead a reasonable person to believe that the attorney was representing that person." *See Bergthold v. Winstead Sechrest & Minick, P.C.*, No. 2-07-325-CV, 2009 WL 226026, at *5 (Tex. App.—Fort Worth, Jan. 29, 2009, no pet.) (mem. op.). Although Lanfear engaged in numerous discussions with Weinberg about potential causes of actions, Lanfear was also actively negotiating a fee agreement regarding potential representation between Strasburger and another firm to share litigation cost. Weinberg was aware of this by July 22, 2009 "or some other early meeting." Thus, Lanfear's actions would not have led a reasonable person to believe Strasburger had an attorney-client relationship with TSI.

Also telling, TSI was separately represented by two other attorneys, Alex Katzman and Will Underwood, during negotiation of the fee agreement. *See, e.g., Valls*, 314 S.W.3d at 634 (concluding no implied attorney-client relationship existed when, among other things, the party was represented by another attorney); *see also Great Am. Ins. Co. v. Christopher*, No. 3:02-CV-

–14–

2112-P, 2003 WL 21414676, at \*4 (N.D. Tex. June 13, 2003) ("most significant fact" in determining no implied relationship existed with an attorney was that potential client was represented by separate counsel at all relevant times). Katzman was the attorney who originally recommended Lanfear to Weinberg and helped set up the initial July 7, 2009 meeting. Underwood was TSI's corporate attorney and described as having "overall corporate counsel capacity to represent Target Strike throughout the [fee] negotiation process." Lanfear engaged in several communications with both attorneys. A January 10, 2010 email from Weinberg to Lanfear (cc: Katzman and Underwood) stated, in part, that "Will Underwood and I have revised the draft agreement you forwarded to us on Friday. . . The changes we have made to your draft are intended to clarify the document . . . We think these changes are straightforward and necessary to fill in the gaps in the definition and structure of the various provisions."

Under these facts, Strasburger's conduct would not have led a reasonable person to believe that it had already agreed to represent TSI prior to signing the fee agreement. Accordingly, Lanfear had no duty to inform TSI that Strasburger was not its lawyer. *Bergthold*, 2009 WL 22602, at \*5.

Having considered TSI's arguments, we conclude TSI failed to raise a genuine issue of material fact as to whether an implied attorney-client relationship existed between Strasburger and TSI prior to the signed fee agreement on January 27, 2010.

We now consider when an attorney-client relationship was established between TSI and Ramos. It is undisputed Ramos did not meet with TSI until December 2, 2009. Ramos and TSI executed the fee agreement on January 27, 2010. TSI has not argued or presented any evidence to support the existence of an implied attorney-client relationship with Ramos. Although TSI at times refers to the "attorneys" in its briefs, the specific arguments emphasize the actions or inactions of Lanfear, not Ramos. Accordingly, TSI did not raise a fact issue about whether the attorney-client relationship between Ramos and TSI was created upon the execution of the fee agreement on

–15–

January 27, 2010. *See Greene's Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.*, 178 S.W.3d 40, at 43 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (attorney-client relationship arises when attorney agrees to render professional services to client and relationship may be created by contract).

We must now consider whether the statutes of limitations expired before an attorney-client relationship existed between TSI and appellees. We first begin by addressing TSI's argument that the Fifth Circuit's determination of when the statute of limitations ran on its misappropriation of trade secrets cause of action was erroneous. TSI asserts when a court is presented with inaccurate or incomplete evidence, it will reach inaccurate conclusions and results. It cites a Ninth Circuit bankruptcy opinion to argue the federal judicial process is not a GIGO (garbage in, garbage out) system. *See In re Wilshire Courtyard*, No. 97-10771, 2015 WL 1544681, at *16 (B.A.P. 9th Cir. Apr. 7, 2015). While "a federal judge has the responsibility to make his or her decision based on the correct law, . . . the federal judge is dependant [sic] on the parties to present competent, credible evidence from which the judge is to make the required findings of fact." *Id.* Thus, TSI asserts appellees' deficiencies in presenting the facts led the federal district court and the Fifth Circuit to determine the wrong date on which limitations began to run on its claims. Further, TSI claims appellees failed to assert the discovery rule and present evidence that its claim did not accrue until sometime after August 2005.

TSI's arguments overlook the judicial doctrine of law of the case. A court of appeals should adhere to prior decisions in litigation except in situations such as when there is a change in facts or parties or if the prior decision was clearly erroneous. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). The law of the case doctrine is based on public policy and is intended to achieve uniformity of decisions and promote judicial economy by narrowing the issue for review in successive stages of litigation. *Id.*

There has been no change in facts or parties in this case since the Fifth Circuit decided the accrual date for purposes of limitations. The Fifth Circuit decided the same limitations issue TSI now argues on appeal. We see no clear error or other reason not to follow the Fifth Circuit's ruling as law of the case. *See, e.g., Gonzalez Guilbot v. Estate of Gonzalez y Vallejo*, 267 S.W.3d 556, 559–60 (Tex. App.—Houston [14th Dist.] 2008) (concluding Fifth Circuit's determination of post-removal jurisdiction was law of the case for same issues raised in state court), *aff'd in part and rev'd in part on other grounds*, 315 S.W.3d 533, 539 n.20 (Tex. 2010) (noting that "[r]egardless of whether the court of appeals should have relied on the law-of-the-case doctrine, the court reached the proper decision). *But see Haase v. Hychem, Inc.*, No. 14-14-00785-CV, 2016 WL 402197, at *6–7 (Tex. App.—Houston [14th Dist.] Feb. 2, 2016, no pet.) (mem. op.) (concluding holding from prior federal proceeding was not law of the case because appellant had amended his petition three times since the federal case so factual allegations were not the same). Moreover, the Fifth Circuit considered the discovery rule and made a *legal* determination that limitations began to run at the latest on August 8, 2005. *See Target Strike, Inc.*, 524 Fed. Appx. at 944. As TSI acknowledges, federal judges have a responsibility to make a decision based on the correct law. *In re Wilshire Courtyard*, 2015 WL 1544681, at *16. Further, the bankruptcy opinion TSI relies on is consistent with this doctrine: "A party cannot complain that it would have . . . presented other evidence if it had known in advance the findings of fact and conclusions of law which the court was going to draw from the . . . other evidence presented at the hearing or trial." *Id*.

In reaching this conclusion, we are unpersuaded by TSI's arguments that actions by the attorneys would have changed the outcome of the case. For example, TSI argues appellees should have presented evidence that it was unreasonable for it to physically monitor the staked claims in the area because of rough terrain, that the BLM website was down during a critical time, and that TSI had no reason to monitor its claims until it learned of an injury. Such arguments would not

have changed the Fifth Circuit's decision because that court relied on *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998), which recognized that landowners have "some obligation to exercise reasonable diligence in protecting their interests" and "cannot be oblivious" to what is happening on their property and adjacent property. Further, the Fifth Circuit was unpersuaded by TSI's argument that because Shaffer used a proxy to stake the claims, it had no reason to suspect the claims were made using its confidential information. *Target Strike, Inc.*, 524 Fed. Appx. at 945. Thus, the Fifth Circuit made a correct legal determination that had TSI exercised reasonable diligence, it should have known of the facts giving rise to the cause of action at the latest date of August 8, 2005.

To the extent TSI argues the Fifth Circuit misapplied the discovery rule because Texas law requires a party to not only know of an injury but also to know that the injury was wrongful, TSI is incorrect. TSI relies on *Pressure Systems International, Inc. v. Southwest Research Institute*, 350 S.W.3d 212 (Tex. App.—San Antonio 2011, pet. denied).

TSI contends the appellees failed to present *Pressure Systems* to the federal courts and had they done so, the outcome would have been different. The record indicates *Pressure Systems* was cited in TSI's Objections to the United States Magistrate Judge's Fifteenth Report and Recommendation filed August 29, 2011 and again in its Objections to the United States Magistrate Judge's Seventeenth Report and Recommendation filed September 12, 2011. Although TSI cited *Pressure Systems* for the general proposition that the discovery rule is written into the statute of limitations for misappropriation of trade secrets, appellees provided this authority to the court for consideration. A court is presumed to know and correctly apply the law. *See Coons-Andersen v. Andersen*, 104 S.W.3d 630, 633 n.1 (Tex. App.—Dallas 2003, no pet.). Indeed, the Fifth Circuit indicated it understood the discovery rule as stated in *Pressure Systems* by noting, "Knowledge of the claims alone would have been sufficient. Even under the discovery rule, the limitations period

is only deferred until the plaintiff discovers or should have discovered an injury and its general cause, not the exact cause in fact and the specific parties responsible." *Target Strike, Inc.*, 524 Fed. Appx. at 945 n.8.

Moreover, in TSI's petition for rehearing to the Fifth Circuit, Strasburger relied on *Pressure Systems* to argue "the accrual of a cause of action is tolled until a claimant discovered *the injury* and that it was *likely caused by the wrongful acts of another*." TSI urged that although the staking of claims in the vicinity "certainly constituted an injury" to TSI, "it was not apparent from the mere staking of these claims that this injury was brought about by the wrongful acts of others." The Fifth Circuit overruled TSI's motion for rehearing despite Strasburger advocating for the application of *Pressure Systems*. Thus, contrary to TSI's assertions, appellees actions or inactions in advocating *Pressure Systems* as controlling authority did not cause the 5th Circuit to reach a wrong decision.

We likewise disagree with TSI that appellees' failure to assert a tortious interference cause of action when Addington's wrongful acts were discovered during a deposition in November of 2010 caused any injury. TSI contends the deposition was the first time it learned of Addington's wrongful acts and appellees had time within the limitations period to amend TSI's petition to add the claim.

We assume, without deciding, the discovery rule applies to TSI's tortious interference claim. *See, e.g., L.C. v. A.D.*, 971 S.W.2d 512, 515 (Tex. App.—Dallas 1997, pet. denied) (op. on reh'g) (assuming without deciding that discovery rule applied to claims). As acknowledged by TSI in its brief, the Fifth Circuit held that MEI's breach of its promise to keep TSI's proprietary information confidential could be inferred by Shaffer's recording of claims. *Target Strike, Inc.*, 524 Fed. Appx. at 945. Thus, Shaffer's recording of claims, which TSI could have discovered through reasonable diligence of monitoring its target areas, was the legal injury that began

limitations. TSI argues that "even accepting this inference, it does not necessarily follow that knowledge of Shaffer's recording would have alerted TSI that Addington had *tortiously interfered* with the TSI-MEI contract." This argument, however, disregards the general principal that once a party learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know "the specifics of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 207 (Tex. 2011); *Lazo Tech., Inc. v. Hewlett-Packard Co.*, No. 05-14-01060-CV, 2016 WL 80952, at *2 (Tex. App.—Dallas Jan. 7, 2016, pet. denied) (mem. op.). As the Fifth Circuit determined, TSI knew of an alleged wrongful injury by August 8, 2005, at the latest, which would include any claim for tortious interference of contract. The fact that TSI did not know Addington may have interfered with the contract is irrelevant. A party need only know that "its injury was likely caused by *someone's* wrongful act." *See Pressure Sys. Int'l, Inc.*, 350 S.W.3d at 217 (noting plaintiff need not necessarily know *who* performed the wrongful act) (emphasis in original).

Tortious interference is subject to a two-year statute of limitations. *See* TEX. CIV. PRAC. REM. CODE ANN. § 16.003(a); *Lazo Tech., Inc.*, 2016 WL 80952, at *2. Applying the discovery date determined by the Fifth Circuit, limitations ran on TSI's alleged claim by August of 2007. It is undisputed TSI did not meet with appellees until 2009. Accordingly, as a matter of law, appellees failure to allege a tortious interference claim could not have caused any injury.

Finally, TSI contends appellees could have avoided summary judgment by bringing suit in Nevada where its breach of contract claim would have been subjected to a six-year limitations period. *See* NEV. REV. STAT. § 11.190(b). Appellees disagree because the underlying contract contained a mandatory forum-selection clause requiring suit to be filed in Texas.

The MEI contract contained the following "Governing Law" provision:

> This Contract shall be interpreted, construed, and governed by the laws of the State of Texas. The parties hereby submit to the

jurisdiction of courts located in, and venue is hereby stipulated in, Bexar County, Texas.

TSI argues this clause should be construed as a permissive, rather than a mandatory, forum selection clause.

Interpretation and enforceability of forum-selection clauses are legal matters reviewed de novo. *Ramsay v. Tex. Trading Co.*, 254 S.W.3d 620, 626 (Tex. App.—Texarkana 2008, pet. denied). In construing a forum-selection clause, the primary goal is to give effect to the written expression of the parties' agreement. *Phoenix Network Tech. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 615 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We must read the provision in its entirety, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative. *Id.*

An enforceable forum-selection clause must contain explicit language regarding exclusivity. *Mabon, Ltd. v. Afri-Carib Enter., Inc.*, 29 S.W.3d 291, 297 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Such clauses must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive. *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 505 (5th Cir. 2004).

Clauses in which parties merely "consent" or "submit" to jurisdiction of a particular forum, without further language indicating the parties' intent to make jurisdiction exclusive, are permissive. *See In re Wilmer Cutler Pickering Hale & Dorr LLP*, No. 05-08-01395-CV, 2008 WL 5413097, at *4 (Tex. App.—Dallas Dec. 31, 2008, orig. proceeding) (mem. op.); *see also City of New Orleans*, 376 F.3d at 505. Consenting to the jurisdiction of one forum does not necessarily mean that a party has selected an exclusive forum and waived its rights to have the case heard in different forums. *In re Agresti*, No. 13-14-00126-CV, 2014 WL 3408691, at *5 (Tex. App.—Corpus Christi May 29, 2014, orig. proceeding) (mem. op.). Thus, a forum-selection clause providing that a particular court "shall" have jurisdiction over a controversy may be permissive,

even though use of the term "shall" is typically mandatory, because it does not foreclose the possibility that other courts may also have jurisdiction. *See, e.g., Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 956 (5th Cir. 1974) ("This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York" was not a mandatory forum-selection clause); *see also Mabon*, 29 S.W.3d at 297 ("laws of the Federal Government of Nigeria will apply and the Federal District of Nigeria shall have venue" simply meant that the Nigerian courts were an acceptable venue for the assertion of claims but did not provide for exclusive jurisdiction). On the other hand, where the clause also refers to venue, specifications of a forum can be sufficient to make the clause mandatory. *See Milk 'n' More v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992); *see also Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) ("[j]urisdiction shall be in the State of Colorado, and venue shall lie in the County of El Paso, Colorado" was a mandatory forum selection clause).

Unfortunately, these broad concepts do not always translate into a straightforward test for the seemingly endless variations of forum-selection clauses. Indeed, we recognize that the clause in this case could be viewed as similar to clauses that other jurisdictions have interpreted as permissive. It does not contain the explicit terms of exclusivity common to many mandatory clauses.

TSI relies on *Southwest Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322 (Tex. App.—Austin 1999, pet. denied) to support its position that the forum-selection clause is permissive. That case is distinguishable. There, the court considered whether the following provision was mandatory: "This Agreement shall be governed by the laws of the State of Minnesota. The parties stipulate to jurisdiction and venue in Ramsey County, Minnesota, as if this Agreement were executed in Minnesota." *Id*. at 323. In determining the clause was a permissive forum-selection clause, the court first emphasized that "[b]y stipulating to jurisdiction in Ramsey

County 'as if the agreement were executed in Minnesota,' the parties appear to have been creating a prophylactic relation to that state sufficient to insure that Minnesota courts could exercise jurisdiction over the parties," which recognized the agreement itself had little or no connection to Minnesota that would support jurisdiction over Southwest Intelecom, an Austin corporation. *Id.* at 325. In contrast, TSI and MEI were Texas corporations subject to jurisdiction in Texas; therefore, unlike the parties in *Southwest Intelecom*, they did not need the clause to create a prophylactic relationship to the state to insure jurisdiction in Texas. Thus, interpreting the clause at issue as permissive could render the forum-selection clause superfluous—an outcome we strive to avoid. *See Phoenix Network Tech. (Europe) Ltd.*, 177 S.W.3d at 615 (court must read the provision in its entirety, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative).

Next, the *Southwest Intelecom* court emphasized the meaning of "stipulate" as defined by Black's Law Dictionary 1415 (6th ed. 1990) ("arrange or settle definitely"). The court determined by substituting these words in the clause, "the parties' intent becomes more clear: 'The Parties [arrange or settle definitely] jurisdiction and venue in Ramsey County, Minnesota . . . ." *Southwest Intelecom, Inc.*, 997 S.W.2d at 326. The court concluded the provision, as modified, did not provide for exclusive jurisdiction in Ramsey County, Minnesota, but instead, merely settled any question of whether the courts of that state had jurisdiction. *Id.*

Black's Law Dictionary no longer defines "stipulate." However, a review of other sources' definitions are instructive. Merriam-Webster's online dictionary defines "stipulate" as "to make an agreement or covenant to do or forbear something: contract; to specify as a condition or requirement (as of an agreement or offer); to give a guarantee of." *See Stipulate*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com/dictionary/stipulate (last visited November 16, 2018). Bryan Garner's A Dictionary of Modern Legal Usage defines "stipulate" as "(1) (of an

agreement) to specify (something) as an essential part of the contract; (2) (of a party to an agreement) to require or insist upon (something) as an essential condition; or (3) to make express demand *for* something as a condition of an agreement." *Stipulate*, A DICTIONARY OF MODERN LEGAL USES (2d ed. 1995). These definitions indicate that when a party stipulates to something, it is an express demand of a specified and essential condition of the contract.

Further, unlike the forum-selection clause in *Southwest Intelecom* that stipulated to both jurisdiction and venue, the clause at issue here "submit[ted]" to the courts in Bexar County, Texas *and* "stipulated" to venue in Bexar County, Texas. Merriam-Webster's online dictionary defines "submit" as "to yield to governance or authority; to subject to a condition, treatment, or operation; to yield oneself to the authority or will of another." *See Submit*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com/dictionary/submit (last visited November 16, 2018). Thus, when read together, the forum-selection clause indicates an intention for the parties to not only yield to the authority of the courts in Bexar County Texas, but also to specify and require as a condition of the contract that venue be in Bexar County, Texas. Thus, the language of the forum-selection clause is mandatory. *See, e.g., City of New Orleans v. Nat'l Servs. Cleaning Corp.*, Civ. A. No. 96-1601, 1996 WL 419750, at *3 (E.D.La. July 24, 1996) (forum-selection clause that not only "consented to" but "stipulated to" personal jurisdiction and venue of the Civil District Court for the Parish of Orleans, Louisiana was mandatory); *Hedge Fund Solutions, LLC v. New Frontier Media, Inc.*, Civ. A. No. 12-5481, 2014 WL 796208 at *3 (E.D.Pa. Feb. 28, 2014) (observing that a "hallmark of mandatory clauses" is the identification of a specific venue). Accordingly, the alleged failure of the appellees to file a breach of contract suit in Nevada could not have caused any of TSI's alleged injuries because suit was not proper in that forum.

Having rejected TSI's arguments that fact issues exist as to whether the actions or inactions by appellees' handling of the underlying lawsuit could have changed the outcome of the case and

altered the limitations date determined by the Fifth Circuit, we lastly consider whether appellees had any duty to TSI at the time TSI approached them with the case.

TSI's underlying claims involved limitations ranging from two to four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (two years for negligence, gross negligence, conversion); *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 869 (Tex. 2007) (two years for unjust enrichment); *HECI*, 982 S.W.2d at 885 (two years for negligent misrepresentation); TEX. CIV. PRAC. & REM. CODE ANN. § 16.010(a) (three years for misappropriation of trade secrets) & § 16.051 (four years for breach of contract). Thus, limitations ran on all of TSI's claims by August 8, 2009, at the latest. Neither Strasburger nor Ramos represented TSI or had an implied attorney-client relationship with TSI at that time; therefore, no act or omission by the lawyers could have caused any injury to support a legal malpractice claim. *See, e.g.*, *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 676 (Tex. App.—Houston [1st Dist.] 1996, no writ) (attorneys had burden of proving as a matter of law that, at the time client hired firm, limitations on his causes of action had already run pursuant to the discovery rule). Accordingly, the trial court did not err by granting appellees' traditional motions for summary judgment. We overrule TSI's first and second issues.

### Conclusion

The judgment of the trial court is affirmed.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

180434F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TARGET STRIKE, INC., Appellant

No. 05-18-00434-CV     V.

STRASBURGER & PRICE, L.L.P.;
DANIEL LANFEAR; DONATO RAMOS;
ALFREDO RAMOS; AND THE LAW
OFFICE OF DONATO D. RAMOS, PLLC,
Appellees

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-06568.
Opinion delivered by Justice Bridges.
Justices Francis and Lang-Miers
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees STRASBURGER & PRICE, L.L.P., DANIEL
LANFEAR, DONATO RAMOS, ALFREDO RAMOS, AND THE LAW OFFICE OF
DONATO D. RAMOS, PLLC recover their costs of this appeal from appellant TARGET
STRIKE, INC.

Judgment entered November 19, 2018.