David KIGER, Appellant

v.

Ray A. BALESTRI, Appellee.

No. 05–10–01308–CV.

Court of Appeals of Texas, Dallas.

Aug. 3, 2012.

Rehearing Overruled Sept. 10, 2012.

Geoffrey S. Harper, Thomas M. Melsheimer, James Kristopher Long, Fish & Richardson P.C., Dallas, TX, for Appellant.

Joel Wilson Reese, Reese Gordon Marketos, LLP, Dallas, TX, for Appellee.

Before Justices O'NEILL, MARTIN RICHTER, and MYERS.

## OPINION

Opinion By Justice MYERS.

This is an appeal brought by appellant David Kiger (Kiger) from a summary judgment granted in favor of appellee Ray A. Balestri (Balestri). In three issues, Kiger contends the trial court erred by granting summary judgment on his breach of fiduciary duty claim. We affirm the court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

Balestri is a licensed transactional attorney. From 1985 until February of 1992, he practiced law at the firm of Akin, Gump, Strauss, Hauer & Feld, in Dallas, Texas. From March of 1992 until March of 2000, he practiced law at a firm he co-founded with Steven R. Block (Block), Block & Balestri, after which Balestri quit the practice of law to work as Chief Financial Officer of Attenza.com, Inc. When he left the practice of law, Balestri's clients were transferred to Block, who joined another law firm.

Balestri and Kiger have known each other for many years. At the heart of their dispute is Kiger's contention that, in 2001, he conceived of a "novel idea" to start a company that would sell electricity through multi-level marketing. Kiger planned to use the experience and business contacts of former executives and employees of Excel Communications, a defunct company that sold long distance telephone services through multi-level marketing, to build his business. Kiger, however, did not know any former Excel employees.

On June 27, 2001, Kiger sent Balestri an e-mail with the subject line "Question," which asked, "Do you know anyone who has worked at Excel Communication at a high level." Balestri replied, "Currently works there or used to work there?" Kiger e-mailed, "Used to would be best." Balestri responded, "Nick Merrick, who used to be their CFO and Chris Dance, who used to be their General Counsel. Do you want their contact info." Kiger replied, "Yes[,] please." Then, on June 28, Balestri and Kiger exchanged the following e-mails:

Balestri: Cool. I'll let them know that you'll be calling. (I'll get you their contact info later today.) What should I tell them that you want to contact them about?

Kiger: A reseller based power deal. We will be utilizing all existing systems at Worldwide Express but will shift distribution to the Excel Model. $220 Bil commercial and residential market opportunity (10x bigger than LD). Tenta-

tive name for the company is Energy-One.

The e-mails were followed by a telephone call between the parties, where they discussed these issues in more detail.

Kiger did not pursue his business idea. There is no indication in the record he formed a multi-level marketing company to sell electricity, obtained a license to sell electricity, hired employees, or solicited customers. In mid–2002, meanwhile, Balestri left Attenza and returned to the practice of law. Then, in February of 2004, Robert Snyder, an entrepreneur with whom Balestri had invested in other ventures, contacted Balestri to introduce him to a group that needed investors for a business that would aggregate electricity in the commercial and industrial market. Balestri attended two meetings to hear sales pitches but, as he noted in his summary judgment affidavit, he "came away from the meetings 'underwhelmed.' "

Neither Balestri nor Snyder invested in the electricity aggregation idea. Over the next few months, Snyder decided to start his own retail electricity provider. In August of 2004, Snyder hired Balestri's law firm to incorporate this electricity provider, which was called Stream Energy, with the Texas Secretary of State. In January of 2005, the Texas Public Utility Commission granted Stream Energy a license to sell electricity. In June, Balestri became an investor in Stream Energy.

In September of 2005, Balestri, Kiger, and another individual met at a restaurant for dinner to celebrate Kiger's birthday. At the dinner, Balestri mentioned his recent investment in Stream Energy to Kiger and suggested he consider investing, at which point, according to Balestri's summary judgment affidavit, Kiger "acted upset over my investment." Balestri said he was "baffled by Kiger's reaction." Later, at Kiger's request, Balestri "set up a meeting between Kiger and Snyder so Kiger could explore the possibility of investing in Stream Energy." Kiger told Balestri, according to Balestri's affidavit, "he was not interested in investing in Stream Energy" because "the valuation was too high" and he "wanted to have invested in the ground floor," as Balestri "had done."

Kiger sued Balestri for breach of fiduciary duty, alleging an attorney-client relationship existed between them and Balestri breached his fiduciary relationship with Kiger by revealing confidential and trade secret information to Stream Energy for the purpose of implementing Kiger's business idea.[1] Balestri filed both traditional and no-evidence summary judgment motions as to this claim. In the traditional summary judgment motion, Balestri argued Kiger could not prevail, as a matter of law, on the breach of fiduciary duty claim because (1) Balestri did not owe a fiduciary duty to Kiger; (2) there was no evidence to show Balestri owed a fiduciary duty to Kiger; (3) Balestri did not breach a fiduciary duty owed to Kiger; (4) there was no evidence to show Balestri breached a fiduciary duty owed to Kiger; and (5) there was no evidence to show Balestri profited from breaching a fiduciary duty owed to Kiger. In his no-evidence summary judgment motion, Balestri argued there was no evidence (1) Kiger suffered damages or that Balestri profited from the alleged breach of fiduciary duty, (2) Balestri owed a fiduciary duty to Kiger, or (3) that Balestri breached a fiduciary duty to Kiger. The trial court granted both of Balestri's motions, dismissing Kiger's

---

1. In addition to the breach of fiduciary duty claim, Kiger's original petition also included claims for constructive trust and moneys-had-and-received, neither of which are at issue in this appeal.

claims with prejudice and ordering he take nothing from Balestri.

## DISCUSSION

■ Kiger raises several related and overlapping issues. He argues the trial court erred, as a matter of law, by granting traditional summary judgment on his breach of fiduciary duty claim because Balestri did not conclusively establish (1) the lack of a fiduciary duty and (2) that there was no breach of a fiduciary duty. In his third issue, Kiger alleges the trial court erred by granting a no-evidence summary judgment on the breach of fiduciary duty claim because Kiger presented sufficient evidence of each element to raise a genuine issue of material fact regarding each element.

The standard of review for both a traditional and a no-evidence summary judgment is well known. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Gen. Mills Rests., Inc. v. Texas Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.); *Neary v. Mikob Properties, Inc.*, 340 S.W.3d 578, 583 (Tex.App.-Dallas 2011, no pet.). Regarding the traditional motion for summary judgment, Balestri had the burden to demonstrate that no genuine issues of material fact existed and he was entitled to judgment as a matter of law. *See Nixon*, 690 S.W.2d at 548–49. To defeat the no-evidence summary judgment, Kiger was required to present sufficient evidence to raise a genuine issue of fact on each challenged element of his claim. *See Gen. Mills*, 12 S.W.3d at 832–33; *Neary*, 340 S.W.3d at 583.

We review the no-evidence motion for summary judgment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills*, 12 S.W.3d at 832–33. Thus, we determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Id.* at 833. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (1983)).

When analyzing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant. *Nixon*, 690 S.W.2d at 549; *Gen. Mills*, 12 S.W.3d at 833; *Drake v. Wilson N. Jones Med. Ctr.*, 259 S.W.3d 386, 388 (Tex.App.-Dallas 2008, pet. denied). When, as in this case, the trial court does not state the basis for granting summary judgment, the appellant must show on appeal that each independent ground alleged is insufficient to support the summary judgment granted. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995); *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 875 (Tex.App.-Dallas 2005, no pet.); *Juarez v. Longoria*, 303 S.W.3d 329, 330 (Tex.App.-El Paso 2009, no pet.).

■ Whether a fiduciary duty exists is a question of law. *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex.2007). Fiduciary duties are imposed on parties to certain relationships based on the special nature of those relationships. *Id.* A fiduciary relationship exists, for example, between attorneys and clients as a matter of law. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld*, 105 S.W.3d 244, 253 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). However, an attorney-client relationship must exist before a fiduciary duty arises. *See id.* at 254.

■ The attorney-client relationship is a contractual relationship that arises from a lawyer's agreement to render pro-

fessional services to a client. *Kennedy v. Gulf Coast Cancer & Diagnostic Ctr.*, 326 S.W.3d 352, 357 (Tex.App.-Houston [1st Dist.] 2010, no pet.); *Greene's Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.*, 178 S.W.3d 40, 43 (Tex. App.-Houston [1st Dist.] 2005, no pet.). The parties should clearly and expressly agree to the nature of the work to be done and the compensation to be paid. *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 634 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Hill v. Bartlette*, 181 S.W.3d 541, 547 (Tex.App.-Texarkana 2005, no pet.). The agreement may sometimes be implied from the parties' conduct. *See Valls*, 314 S.W.3d at 634. But whether the agreement is express or implied, there must be evidence *both* parties intended to create an attorney-client relationship—one party's subjective belief is insufficient to raise a question of fact to defeat summary judgment. *See id.* (citing *Tanox*, 105 S.W.3d at 254; *Roberts v. Healey*, 991 S.W.2d 873, 880–81 (Tex.App.-Houston [14th Dist.] 1999, pet. denied)); *see also Span Enters. v. Wood*, 274 S.W.3d 854, 858 (Tex.App.-Houston [1st Dist.] 2008, no pet.) ("We determine whether an [attorney-client] contract can be implied using an objective standard, ... and we do not consider [the parties'] unstated, subjective belief").

The summary judgment evidence in this case fails to raise a fact issue regarding the existence of an attorney-client relationship between Kiger and Balestri. In his affidavit, Balestri states:

4. First, on June 27, 2001, the date that Kiger contends that I was representing him as his attorney, I was working as the Chief Financial Officer of Attenza.com. I had not worked as a lawyer in private practice for more than a year prior to June 2001. During this time period, I did not have a law office, I did not have employment other than my job at Attenza.com, and I did not bill any clients for any legal services. As he admitted in his deposition, Kiger knew that, in June 2001, I was working as the Chief Financial Officer at Attenza.com, a software company.

5. Second, I have *never* represented Kiger as his personal attorney. Prior to joining Attenza.com, I represented one company in which Kiger was an investor, but Kiger, himself, was never my client.

6. Third, I never had any communications or discussions with Kiger where I agreed to serve as his lawyer or where he indicated that he thought I was serving as his lawyer in any capacity or for any reason, including any matter related to his electric company idea. I never sent him an engagement letter or a contract for legal services. I never billed Kiger for any legal services.

Kiger did not file a contravening affidavit, but in his deposition he stated that, when he contacted Balestri in June of 2001, he knew Balestri was an employee of Attenza, which was a software company and not in the business of providing legal services. During his deposition, Kiger was also asked about the e-mails he exchanged with Balestri:

Q. And in that very first communication with Mr. Balestri regarding the electric company idea, you asked him "do you know anyone who has worked at Excel Communications at a high level"; is that correct?

A. Correct.

Q. Is there anything about that question that you believe is requesting legal advice?

A. No.

Q. The next one, Mr. Balestri responds. And Mr. Balestri says "cur-

rently works there or used to work there"; is that correct?

A. Correct.

Q. And is there anything about that communication that you think is legal advice?

A. No.

Q. You respond to Mr. Balestri and you say that "used to work would be best"; is that correct?

A. Correct.

Q. Is there anything about that communication that you think is requesting legal advice?

A. No,

Q. And in response to your e-mail, Mr. Balestri, who was chief financial officer of Attenza at the time, tells you, "Nick Merrick, who used to be their CFO, and Chris Dance, who used to be their general counsel; do you want their contact info?" Did I read that correctly?

A. You did.

Q. Is there anything about that communication that you believe is requesting legal advice?

A. No.

Q. Is there anything about that communication that you believe is legal advice?

A. No, no.

Q. In response to that request asking if you want their contact information, you say "yes, please"; is that correct?

A. I do, yes.

Q. Is there anything about that communication that you believe is requesting legal advice?

A. No.

Q. In response to your e-mail about wanting their contact information, Mr. Balestri says, "cool, I'll let them know that you'll be calling; I'll get you their contact info later today; what should I tell them you want to contact them about?" Did I read that correctly?

A. You did.

Q. Is there anything about that communication that you believe is legal advice from Mr. Balestri?

A. No.

As for whether Balestri was his attorney, Kiger's deposition testimony included the following exchange:

Q: What did Ray Balestri do or say that made you believe he was representing you as your legal con—counsel in connection with the electric company idea?

A: I—it was assumed by me and—that he was my attorney. I—I don't know that he stated anything. I had used him previously, had continued to use him. And I thought I had that relationship with him.

Q. What were the terms under which Mr. Balestri would represent you with regard to the electric company idea in 2001?

A. The terms? I'm—

Q. Yeah. I mean, you have terms under which Fish & Richardson—

A. Yes.

Q. —is representing you, right?

A. Right.

Q. You'll pay them an hourly rate or you'll pay them a contingent fee.

A. Uh-huh.

Q. Whatever the terms are—

A. Uh-huh.

Q. —you—you sign an agreement, and it specifies the terms under which they're representing you, right?

A. Correct. I did.

Q. What are the terms under which Mr. Balestri would represent you with regard to the electric company idea?

A: I'm not aware of any terms that existed.

Q: Did you intend to pay Mr. Balestri for his services with regard to the electric company idea?

A. I—if I were involved, I would have paid him.

Q: Were—do you know if you were invoiced?

A. I don't know.

Q. Did you have an agreement to pay Mr. Balestri for his legal services with regard to the electric company idea?

A. Specific to that idea, no, I'm not aware of any.

Q. Did you understand that Mr. Balestri would charge you for his legal services with regard to the electric company idea?

A: I was not aware that he would.

Q. What was the scope of Ray Balestri's representation of you with regard to the electric company idea?

* * * *

A. It would have been the advice that he gave me when I—I talked to him about it in that phone call that was after the e-mail exchanges we discussed earlier.

Q: Did he agree to form the company?

A. He—not that I recall.

Q: Did he agris (phonetic)—agree to assist you in any particular area of law?

A: Not that I am aware of, no.

Q: Did he agree to draft any documents for you?

A: Not—no, not that I'm aware of.

Q: Did Mr. Balestri agree to review any documents for you with regard to the electric company idea?

A: Not that I'm aware of, no.

Q: Did he agree to meet with you with regard to the electric company idea?

A: No, not that I'm aware of.

Q: Did Mr. Balestri agree to meet with anyone with regard to the electric company idea?

A: No, not that I'm aware of.

Q. Did Mr. Balestri agree to represent you before any regulatory body with regard to the electric company idea?

A. No, he did not.

Q. Did Mr. Balestri agree to represent you in any litigation with regard to the electric company idea?

A. No, he did not.

Kiger argues he presented competent evidence of an implied attorney-client relationship between him and Balestri. He contends that Balestri's focus "on what didn't happen" is too narrow, and that the "entire course of dealing" between the parties supports the existence of such a relationship. *See Vinson & Elkins v. Moran,* 946 S.W.2d 381, 402–05 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.) (conduct of parties and course of dealing are factors to be considered in determining whether attorney-client relationship has been established). We disagree. We find nothing in the record to raise an issue of fact as to whether there was an attorney-client relationship between Kiger and Balestri.

Balestri swore in his affidavit that, before joining Attenza, he represented one company in which Kiger was an investor, but that Kiger was "never" Balestri's client. In rebuttal, Kiger directs our attention to several portions of his deposition testimony, such as statements that he believed Balestri had previously acted as his attorney regarding several matters. But Kiger never pointed to any specific statements or actions by Balestri from which an attorney-client relationship could be implied, and Kiger likewise failed to produce summary judgment evidence regarding the specific terms of the agreement, such as

what services Balestri provided, what fees he charged, the duration of the agreement, or when it was formed.

Kiger also testified that, during their June 2001 telephone conversation, he asked Balestri for advice regarding his business idea, and that Balestri advised him:

Q. Tell me everything that you recall from the phone call with Mr. Balestri in June of 2001 regarding the electric company idea.

A. Okay. I remember calling him, and I think the best of my recollection today would be the—the first thing I indicated to Ray was that I did not want him to immediately contact the people that he knew that had been involved at Excel. And that was the first part.

He had given me the phone number, I believe, of Chris Dance. That's—I remember jotting that again. I then told him again not to communicate with them, that I needed to take my time thinking this through and that I had a lot of questions that I needed to have answered.

And then I proceeded to ask him those questions. And those were around the structure of the company, how to structure it, whether I had a fiduciary duty as the CEO of Worldwide Express to the shareholders to do this one way or another. I asked him for his suggestions and his opinions about that. We discussed making it part of Worldwide Express versus establishing it as a—as—establishing the company as its own entity.

Ray had indicated to me on the phone call that he thought if Worldwide Express was a home run, that he thought EnergyOne was a grand slam. He also indicated to me that—you know, why should I make Roger [2] rich again a second time.

Q. Do you recall anything else said by either you or Mr. Balestri in the phone call in June of 2001 regarding the electric company idea?

A. The only thing I would add to that is Ray thought it was a good idea. He was complimentary and—and thought it would be a very good idea.

* * * *

Q. Okay. Let me go through this. You said one of the discussions was whether you had a fiduciary duty to the shareholders of Worldwide Express?

A. Uh-huh.

Q. Is that correct?

A. Yes, that's correct.

Q. What did Mr. Balestri tell you about your fiduciary duty to the shareholders of Worldwide Express?

A. That if we made it part of Worldwide Express, that Roger would be participating in the ownership of—of that—of that entity.

Q. Did Mr. Balestri tell you that you did have a fiduciary duty to the shareholders of Worldwide Express?

A. I simply remember that as his response, that if we made it part of Worldwide Express, Roger would have owner—an ownership—an ownership stake in that company.

Q. So you don't recall whether Mr. Balestri told you that you did or did not have a fiduciary duty to shareholders of Worldwide Express; is that correct?

A. I don't recall his specific answer to that—to that question. No, I don't.

Kiger further points out that he stated in his deposition he "wasn't aware" Balestri had closed his law office when he went to work for Attenza, and that Balestri main-

2. Roger MacDonell was Kiger's business partner.

295

tained his license to practice law while working there.

 None of these facts, however, suggest an intention or agreement by Balestri to enter into an attorney-client relationship with Kiger. Texas law is clear that one party's subjective beliefs are not evidence of an implied attorney-client relationship. *See Valls*, 314 S.W.3d at 634; *Wood*, 274 S.W.3d at 858; *Tanox*, 105 S.W.3d at 254. Furthermore, even if Balestri previously represented Kiger, and we again note that Balestri attested he *"never* represented Kiger as his personal attorney," Texas law provides that the attorney-client relationship terminates upon completion of the purpose of the employment, absent agreement to the contrary. *Stephenson v. Le-Boeuf*, 16 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). There is no indication in this record of such an agreement. We also note that parties may not avoid summary judgment by relying on speculation or conjecture. *See, e.g., Pink v. Goodyear Tire & Rubber Co.*, 324 S.W.3d 290, 297 (Tex.App.-Beaumont 2010, pet. dism'd); *Smith v. Sw. Bell Tel. Co.*, 101 S.W.3d 698, 702 (Tex.App.-Fort Worth 2003, no pet.); *Branson v. Spiros Partners Ltd.*, No. 04-07-00007-CV, 2007 WL 4547502, at *2 (Tex.App.-San Antonio, Dec. 28, 2007, no pet.) (mem. op., not designated for publication).

Kiger has not shown that Balestri ever agreed to serve as his personal attorney or that Balestri reasonably should have known Kiger was relying on him to provide legal services. Accordingly, since the summary judgment evidence fails to raise a fact issue regarding the existence of an attorney-client relationship between Kiger and Balestri, the trial court did not err by granting Balestri's traditional and no-evidence motions for summary judgment re-

garding Kiger's breach of fiduciary duty claim. We overrule Kiger's issues.

The trial court's judgment is affirmed.