

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00249-CV

_____

STANLEY L. WILEMON, Appellant

V.

SMITH A. BROWNLIE III, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-333153-22

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellee Smith A. Brownlie III was Appellant Stanley L. Wilemon's financial advisor, and the two men also co-owned several entities. Wilemon claims that he trusted Brownlie's financial advice even in operating the co-owned entities and that Brownlie took advantage of that trust by recommending a self-serving transaction (the Transaction)—one in which Wilemon released Brownlie's company's debt in exchange for, among other things, unwanted shares in two oil-and-gas-related entities (the Unwanted Entities). Wilemon sued for breach of fiduciary duty and a slew of fraud-based claims, alleging that Brownlie had defrauded him by failing to give him a copy of the spreadsheet that Brownlie had created to summarize the Transaction, failing to disclose the inflated values attributed to the Unwanted Entities in that spreadsheet, and failing to disclose that the Transaction effectively forgave a portion of the released debt (the Remaining Debt). The trial court granted Brownlie's hybrid summary judgment motion on the claims, and Wilemon appeals the court's order.

But Wilemon failed to produce more than a scintilla of probative evidence to support any of his claims. He offered no evidence that a fiduciary duty existed with respect to the Transaction at issue, and the exhibits that he provided to support his fraud-based claims cut against his contention that the allegedly undisclosed facts—the Unwanted Entities' valuations and the Remaining Debt's forgiveness—were material. The trial court thus properly granted no-evidence summary judgment, and we will affirm.

# I. Background

The parties' relationship spans several decades and contexts.

## A. The Agreement

In 2014, Wilemon entered into an agreement (the Agreement) with Brownlie's wealth advisory firm to "engage [Brownlie] to provide financial planning services and non-discretionary investment advice and recommendations."[1] Although the Agreement's scope and meaning are disputed, its plain language contemplated Brownlie's provision of advisory services such as "review[ing], evaluat[ing,] and provid[ing] feedback and recommendations regarding various [public and private] investment opportunities." The Agreement did not contain a termination date, but it limited its applicability "only to financial advice contained in the financial analyses or investment recommendations individually prepared for Client [i.e., Wilemon]," and it stated that the cost of such financial analyses or investment recommendations would be "billed quarterly in arrears based on the hourly rates of the professionals providing services . . . during the applicable quarter." Wilemon would later claim that, from then on, he viewed Brownlie as his financial advisor on a broad range of issues. Meanwhile, he also engaged in separate business ventures with Brownlie.

---

[1]Years before, Wilemon had hired Brownlie to provide insurance and estate planning services, and Wilemon's company had entered into an advisory agreement with Brownlie's firm.

## B. The Transaction

As relevant here, Brownlie—acting though his corporation, Cotton Creek Investment Company, Ltd. (CCIC)—co-owned an investment company with Wilemon: RAZ. RAZ extended a line of credit to CCIC,[2] and in 2018, Wilemon and CCIC agreed to distribute CCIC's debt to RAZ's owners pro rata based on their ownership percentages.[3] The Transaction at issue in this appeal discharged the portion of CCIC's debt that was distributed to Wilemon.

In the Transaction, Wilemon agreed to release CCIC's debt in exchange for a mix of cash, accounts receivable, mineral interests, and—the key component for our purposes—shares in the Unwanted Entities. The Unwanted Entities were not new to the parties; RAZ, Wilemon, and Brownlie had already invested in them. But according to Wilemon, the Unwanted Entities had not produced any income, so he did not want to acquire any additional shares. Yet, that is precisely what the Transaction provided for.

To assist Tom Hineman—the attorney preparing documentation for the Transaction—Brownlie summarized it in a spreadsheet. The spreadsheet clarified the

[2]CCIC originally obtained the line of credit from RAZ Property Company, Ltd., but that entity subsequently divided, and afterward, RAZ Property Investments, Ltd. held CCIC's line of credit. Because this corporate complexity is immaterial to the present appeal, we refer to the entity holding the CCIC line of credit as RAZ, even though the precise entity shifted over time.

[3]Although Wilemon and CCIC owned equal shares in RAZ when it was formed, Wilemon's ownership later decreased to 33.5% due to unrelated events.

4

fair market values attributed to the Unwanted Entities' shares, and it also revealed that the package of compensation that would be transferred to Wilemon—the cash, accounts receivable, Unwanted Entities' shares, and other interests—would not cover the full amount of CCIC's debt. The spreadsheet reflected a "[p]rojected balance due to [Wilemon]" of more than $700,000 (the Remaining Debt).[4] Brownlie would later claim that he discussed the spreadsheet with Wilemon, but Wilemon disagreed; he recalled Brownlie telling him only that the Transaction would get them "back closer to even."[5]

Either way, it is undisputed that the resulting Transaction documentation was fully disclosed to Wilemon; indeed, it required his signature for approval. And it is undisputed that the Transaction documentation contained a numbered list of the items that Wilemon would receive as compensation. For the Unwanted Entities in particular, the documentation identified the percentage of ownership that Wilemon would acquire as part of the Transaction.

Wilemon would later admit that he did not read the Transaction documentation. Rather, according to him, because he trusted Brownlie, and because

---

[4]The spreadsheet is far from clear. However, both parties treat it as unambiguous, implicitly assuming that merely providing the document to Wilemon would have illuminated the details of the Transaction. Because this is neither disputed nor dispositive, we assume likewise.

[5]Although Wilemon claimed to have relied on this statement, he stated in his deposition that he "wasn't sure what it meant."

"Brownlie told [him] to sign the documents," he signed the documentation without reading it, without knowing that he was acquiring shares in the Unwanted Entities, and without knowing of the Remaining Debt.

## C. Aftermath

When Wilemon learned that he had acquired additional shares in the Unwanted Entities as a result of the Transaction, he demanded that Brownlie "unwind" and "reverse it."[6] Then, for several months thereafter, Wilemon "chased [Brownlie,] asking him where [he was] now" on reversing it. When the "chas[ing]" was unsuccessful,[7] Wilemon spoke with Hineman about the Transaction and learned of the spreadsheet.

Wilemon sued Brownlie for, among other things, breach of fiduciary duty, fraud under the Texas Securities Act, fraudulent inducement, and fraud-based quasi-contract. He also sought punitive damages. To support his allegations of fraud, Wilemon's pleadings pointed to Brownlie's (1) failing to disclose the spreadsheet; (2) failing to disclose the inflated values used for the Unwanted Entities in the

---

[6]Wilemon recalled having asked Brownlie, "What have you done?"

[7]Wilemon initially estimated that he saw the spreadsheet in late 2018, but after his counsel corrected him—suggesting that he had seen the spreadsheet "in 2019 after the documents were signed in 2018"—Wilemon clarified that, "regardless of the year . . . [he] saw the spreadsheet four months after [he] saw the financial statement" that made him aware of his newly acquired shares in the Unwanted Entities. Hineman, for his part, recalled his conversation with Wilemon having occurred in 2020, "some two years" after the Transaction closed.

6

spreadsheet; and (3) failing to disclose that the Transaction had effectively forgiven the Remaining Debt.

## D.     Summary Judgment

Brownlie filed a hybrid summary judgment motion challenging all of Wilemon's claims against him.  In the no-evidence portion of the motion, Brownlie asserted that there was no evidence of (1) the existence of a fiduciary duty; (2) Brownlie's having committed "fraud" or a "fraudulent practice" as defined by the Securities Act; (3) Wilemon's fraudulent inducement claim; or (4) the existence of a fraudulent scheme to support Wilemon's claim for quasi-contract.

Wilemon responded with, first, a justification of his fiduciary duty claim.  He argued that "investment or financial advisors owe [formal] fiduciary duties to their clients" and that "Brownlie was [his] investment advisor," relying on the Agreement as proof.[8]    He emphasized that the Agreement contemplated Brownlie's "review[ing] . . . and provid[ing] feedback and recommendations regarding various [public and private equity] investment opportunities"—opportunities like, he asserted, the Transaction.  Wilemon's summary judgment response did not identify any evidence that Brownlie had actually provided him with investment analysis, feedback, or recommendations related to the Transaction, though.

---

[8]Wilemon's summary judgment response also referenced an earlier advisory agreement involving his separate company, but on appeal, he does not claim that this earlier agreement extended to the Transaction.

So, at the summary judgment hearing that followed, the trial court asked Wilemon to clarify "specifically what did [Brownlie] say to him that was investment advice" related to the Transaction. Wilemon cited Brownlie's statement that he "ha[d] a way to get us . . . back closer[] to even,"[9] but the trial court rejected the statement as "not investment advice."[10]

Meanwhile, Wilemon attempted to justify his fraud-based claims by providing evidence of Brownlie's alleged failures to disclose information—evidence that included Wilemon's own deposition.[11] In that deposition, Wilemon confirmed that he was not accusing Brownlie of having "manipulated the information to falsely present . . . the [Unwanted Entities'] value."[12] Although he questioned whether he

---

[9]Later, when Wilemon veered to another topic, the trial court refocused the conversation, repeating that it "just want[ed Wilemon] to tell [the court] what he told Wilemon that was investment advice." Wilemon again cited Brownlie's statement that he would "get [them] closer to even."

[10]The trial court also commented that the Transaction itself was "not an investment."

[11]Wilemon also provided an affidavit from an expert who opined that the values listed in the spreadsheet for the Unwanted Entities should have been discounted to reflect certain considerations, such as a lack of marketability.

[12]In Brownlie's deposition—which accompanied Wilemon's summary judgment response—Brownlie stated that the spreadsheet's valuations for the Unwanted Entities' shares had come from a third-party firm that had performed similar valuations in the past.

8

could have negotiated a better price for the Unwanted Entities' shares,[13] he explained that his core complaint was not Brownlie's "allocating values to the [Unwanted Entities]" nor Brownlie's failure to disclose the Transaction's details. Indeed, Wilemon admitted that the information in Brownlie's spreadsheet had likely been the same as that in the Transaction documentation, that the documentation had "very clearly state[d] what was being transferred," that he had received the documentation before he had agreed to the Transaction, and that he had signed the documentation without reading it. Wilemon's core complaint instead stemmed from Brownlie's failure to disclose the Transaction in a way that was easy for Wilemon to understand[14]—as Wilemon had expected his financial advisor to do—and Brownlie's recommendation of investments that were "not suitable" for Wilemon's portfolio. He summarized "the essence of the whole thing" as Brownlie's "having [him] sign something that [Wilemon] didn't know what it was."

---

[13]Wilemon explained that "Smith was screwed in his divorce situation" at the time so anything transferred as part of the Transaction "was essentially a fire sale." Thus, Wilemon opined that, "regardless of the valuation [Brownlie] got" from a third party, "the valuations were extremely inflated . . . because of the situation . . . of the transfer," and if Wilemon "had been forced with a gun to [his] head to take the [Unwanted Entities' shares] . . . , [he] would have demanded to have gotten more than one valuation."

[14]Wilemon stated that "it would [have] be[en] much much much easier for [him] to look at a worksheet . . . . and have someone explaining with the worksheet to [him] what's happening versus piles of paper and say, okay, read that and then sign it."

The trial court granted Brownlie's hybrid summary judgment motion without specifying a basis for its judgment.[15]

## II. Standard of Review

We review a summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant. *Keenan v. Robin*, 709 S.W.3d 595, 600 (Tex. 2024); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). When, as here, a defendant moves for both no-evidence and traditional summary judgment, we review the no-evidence grounds first, and if those grounds are dispositive, we need not reach the traditional grounds.[16] *Keenan*, 709 S.W.3d at 600 (noting that "[i]f the nonmovant fails to overcome its no-evidence burden on any claim, we need not address the traditional motion to the extent it addresses the same claim"); *First United Pentecostal Church*, 514 S.W.3d at 219–20 (similar); *see* Tex. R. App. P. 47.1.

If a defendant moves for no-evidence summary judgment on one or more elements of a plaintiff's claims, then the plaintiff bears the burden to produce more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged elements. *Keenan*, 709 S.W.3d at 600; *Timpte Indus.*, 286 S.W.3d at 310; *see*

---

[15]The order became final years later when the trial court entered a judgment disposing of other claims and parties.

[16]Because we resolve the appeal on Brownlie's no-evidence summary judgment grounds, we need not address Wilemon's challenges to the portions of Brownlie's motion that sought traditional summary judgment. *See* Tex. R. App. P. 47.1.

Tex. R. Civ. P. 166a(i).  Unless the plaintiff carries this burden, the trial court must grant the no-evidence summary judgment motion.  Tex. R. Civ. P. 166a(i).

### III.  Discussion

In Wilemon's two dispositive appellate arguments,[17] he asserts that he produced more than a scintilla of evidence showing (1) the existence of a fiduciary duty; and (2) fraud.

### A.  Fiduciary Duty:  No evidence of duty.

First, Wilemon contends that the trial court erred by granting a no-evidence summary judgment on his claim for breach of fiduciary duty because, according to him, he raised a fact issue regarding the existence of a formal fiduciary duty based on Brownlie's role as his financial advisor.[18]

This court has recognized that a "financial advisor" may owe a fiduciary duty to his clients in certain instances, *see Kang v. Song,* No. 02-15-00148-CV, 2016 WL 4903271, at *7 (Tex. App.—Fort Worth Sept. 15, 2016, no pet.) (mem. op.) (recognizing that "[a]n investment or financial advisor generally owes a fiduciary duty to clients"), and Wilemon treats this duty as formal, meaning that he understands it to

---

[17]Wilemon organizes his appeal into two broad appellate issues challenging (1) the no-evidence summary judgment and (2) the traditional summary judgment. Within these broad issues, Wilemon raises subissues specific to each of his claims. We restructure Wilemon's issues to focus on his two dispositive arguments.

[18]Generally, "[w]hether a fiduciary duty exists is a question of law."  *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.,* 235 S.W.3d 695, 700 (Tex. 2007).

arise automatically from the financial advisor's role. *See Pitts v. Rivas*, 709 S.W.3d 517, 530–34 (Tex. 2025) (Huddle, J., concurring) (explaining that the law recognizes formal fiduciary duties "when a person has undertaken a particular role that the law regards as fiduciary in nature (trustee, guardian, executor, corporate director, to name a few)"); *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) ("In certain formal relationships, such as an attorney–client or trustee relationship, a fiduciary duty arises as a matter of law."). Wilemon further understands the Agreement to provide for such a role, noting its description of Brownlie as Wilemon's "[f]inancial [a]dvisor." *Cf. Torres v. Whitaker Chalk Swindle & Schwartz, PLLC*, No. 03-15-00706-CV, 2016 WL 3391417, at *1–2 (Tex. App.—Austin June 15, 2016, no pet.) (mem. op.) (reviewing existence of fiduciary duty, noting that duty's existence turned on the existence of an attorney–client relationship between the parties, and explaining that an attorney–client relationship is "contractual in nature"); *Kiger v. Balestri*, 376 S.W.3d 287, 290–91 (Tex. App.—Dallas 2012, pet. denied) (explaining that an attorney–client relationship gives rise to a fiduciary duty; that the "relationship must exist before a fiduciary duty arises"; and that, generally, it is "a contractual relationship that arises from a lawyer's agreement to render professional services to a client").

But even if we assume these premises,[19] a fiduciary's duty "extend[s] only to dealings within the scope of the underlying relationship of the parties." *Joe v. Two*

---

[19]Specifically, we assume not only that a financial advisor's role gives rise to an automatic, formal fiduciary relationship but also that the law's conception of that role

*Thirty Nine Joint Venture*, 145 S.W.3d 150, 159–60 (Tex. 2004) (recognizing rule in the context of a lawyer's fiduciary duties to a client and noting that, while "an attorney owes a client a duty to inform the client of matters material to the representation," that duty "does not extend to matters beyond the scope of the representation"); *see Rankin v. Naftalis*, 557 S.W.2d 940, 944–45 (Tex. 1977) (holding fiduciary duties that "arose from the relationship of joint ownership of the mineral rights of a particular mineral lease" did not "extend past the development of the particular lease and activities incident to that development"); *Greenberg Traurig, LLP v. Nat'l Am. Ins. Co.*, 448 S.W.3d 115, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (recognizing rule in the context of a lawyer's fiduciary duty to disclose certain facts to longstanding client); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 416 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (op. on rh'g) ("A fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties."). The question is whether there is any evidence that Brownlie's

---

encompasses or aligns with Brownlie's responsibilities under the Agreement. However, these are assumptions. Even under the Agreement, Brownlie provided non-discretionary services, meaning that he lacked control over Wilemon's assets and lacked the ability to take actions on his behalf. *Cf. Pitts*, 709 S.W.3d at 530–34 (Huddle, J., concurring) (noting—in concurrence joined by three other justices—that the law recognizes formal fiduciary duties for certain roles involving "a high degree of control over the legal, financial, [or] . . . personal affairs of another"); *Kang*, 2016 WL 4903271, at *7 n.42 (noting that courts "look to the substance of the relationship rather than relying on titles to discern fiduciary responsibility"). Because the parties' dispute focuses on the Agreement's applicability to the Transaction, though, and because that issue is dispositive, we limit our discussion accordingly.

13

Agreement-defined role as Wilemon's financial advisor extended to the Transaction at issue. *See Kang*, 2016 WL 4903271, at *7 (noting that "what a fiduciary duty requires of the fiduciary can vary").

Wilemon argues that there is, pointing to the Agreement's wide range of contemplated services, its reference to Brownlie's "evaluat[ing] and provid[ing] feedback" on "investment opportunities," and its lack of a termination date.[20] But the Agreement's breadth does not resolve the matter. True, it detailed a variety of potential advisory services—including Brownlie's evaluation of investment opportunities—but it expressly stated that "[t]his [A]greement shall be applicable only to financial advice contained in the financial analyses or investment recommendations individually prepared for Client." Wilemon offered no evidence that Brownlie prepared Transaction-related "financial analyses or investment recommendations" for him or that he was billed for any Transaction-related advisory services.

---

[20]We assume without deciding that the Agreement remained in effect in 2018. However, the summary judgment record calls this assumption into question. Brownlie's firm was acquired in 2017, and Brownlie subsequently offered advisory services through a different firm. Wilemon claims that his Agreement was assigned to Brownlie's new firm, pointing to a form that Wilemon signed in 2017 consenting to the assignment. But the consent form applied to "each Investment Advisory Agreement . . . described in the [accompanying] letter [from the firm]," and although Wilemon's summary judgment response attached the consent form, it did not attach the "accompanying letter." Meanwhile, other summary judgment evidence that Wilemon offered—such as the new firm's corporate representative's deposition—tended to show that the Agreement was not assigned to Brownlie's new firm and that the new firm never invoiced Wilemon for advisory services.

14

On the contrary, at the time of the summary judgment, Wilemon's live pleading alleged that no investment analysis, evaluation, or feedback had occurred. He had pleaded that Brownlie "made no determination that the[] investments [in the Unwanted Entities] were suitable" and "did not communicate with Wilemon about whether the new investments in [the Unwanted Entities] were appropriate." Wilemon then reiterated as much in the affidavit that he offered to support his summary judgment response; he averred that Brownlie "never told [him] the supposed value of the [Unwanted Entities]" and "never communicated with [him] about whether the investments in [the Unwanted Entities] were appropriate or suitable."

When the trial court pressed Wilemon to identify the "investment advice" he had received from Brownlie regarding the Transaction, the only "advice" Wilemon identified was Brownlie's statement that he had a way to get them "back closer to even." But as the trial court commented at the time, "[t]hat is not investment advice" And even Wilemon, in his deposition, admitted that he "wasn't sure what [the statement] meant."

It is thus unsurprising that Wilemon largely abandons his reliance on this statement on appeal, instead identifying evidence of another piece of Transaction-related advice: his averment that "Brownlie told [him] to sign the documents." But such a vague statement—without more—can hardly be characterized as a "financial analys[i]s" or an "investment recommendation[]" or "evaluat[ion]." And Wilemon

15

does not enunciate any rationale to support treating it as such. There was simply no evidence that Brownlie offered Wilemon investment advice related to the Transaction.

Nor were Wilemon's or Hineman's uses of the label "financial advisor" sufficient to raise a fact question on the issue.[21] Neither Wilemon nor Hineman described any factual events that showed Brownlie having actually provided Wilemon with an investment analysis or recommendation related to the Transaction.[22] *Cf. Kiger*, 376 S.W.3d at 291 (noting in the context of attorney–client relationship that "one party's subjective belief [that such relationship exists] is insufficient to raise a question of fact to defeat summary judgment"); *Kang*, 2016 WL 4903271, at \*7 n.42 (noting that "courts . . . 'look to the substance of the relationship rather than relying on titles to discern fiduciary responsibility,' regardless of whether individuals describe themselves as investment advisers, financial advisors, brokers, or dealers").

---

[21]For the same reason, Wilemon's expert witness's affidavit is no evidence that Brownlie was serving as Wilemon's financial advisor. The expert did not claim to have personal knowledge on this subject, and although he stated that Brownlie "w[as] serving in an investment advisory capacity when advising Wilemon," this did nothing more than beg the question of whether Brownlie was advising Wilemon regarding the Transaction. *Cf.* Tex. R. Civ. P. 166a(f) (stating that summary judgment "affidavits shall be made on personal knowledge").

[22]In his reply brief, Wilemon attempts to turn this fact on its head, claiming that the absence of financial advice was evidence of Brownlie's breach and therefore evidence that a fiduciary duty existed. But there can be no breach without first establishing that a duty exists, and the failure to perform a duty is not evidence that a duty exists.

16

In short, the mere fact that Brownlie had agreed to serve as Wilemon's financial advisor in some instances was not, on its own, more than a scintilla of evidence that he served as Wilemon's financial advisor in this instance. *Cf. Joe*, 145 S.W.3d at 159–60 (affirming summary judgment when grounds for legal malpractice claim fell outside scope of representation even though attorney represented client on other matters); *Greenberg Traurig*, 448 S.W.3d at 120–21 (holding that firm's fiduciary duties to longstanding client did not extend to new representation so as to require disclosures); *Shooshtari v. Sweeten*, No. 13-01-00850-CV, 2003 WL 21982225, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 21, 2003, no pet.) (mem. op.) (affirming summary judgment based on absence of fiduciary duty when accountant had performed services for client in the past but there was no evidence of duty related to claims). Wilemon failed to produce more than a scintilla of probative evidence that Brownlie's Agreement-defined role as his financial advisor extended to the Transaction, and that contractual relationship was the sole basis that Wilemon cited for Brownlie's alleged formal fiduciary duties.[23] We thus overrule Wilemon's challenges to the no-evidence summary judgment on his breach of fiduciary duty claim.

---

[23]On appeal, Wilemon alternatively argues that Brownlie owed him (1) a formal fiduciary duty as a partner and (2) an informal fiduciary duty based on their longstanding relationship of trust. But Wilemon did not raise these arguments below. And we "cannot reverse a summary judgment on grounds not presented to the trial court." *Bertucci v. Watkins*, 709 S.W.3d 534, 545 (Tex. 2025); *see City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 679 (Tex. 1979) ("[T]he non-movant must now, in a written answer or response to the motion, expressly present to the trial court those

**B.     Fraud:  No evidence that the undisclosed facts were material.**

Next, Wilemon complains of the trial court's granting of no-evidence summary judgment on his fraud-based claims.[24]  These claims took several different forms— fraud under the Securities Act, fraudulent inducement by nondisclosure,[25] and fraud-based quasi-contract[26]—but all of them were premised on Brownlie's alleged

issues that would defeat the movant's right to a summary judgment and failing to do so, may not later assign them as error on appeal."); *see also* Tex. R. App. P. 47.1.

[24]In the trial court, Wilemon argued that Brownlie had also committed fraud by affirmatively misrepresenting the values of the Unwanted Entities and affirmatively misrepresenting that the Transaction would get them "back closer to even."  But on appeal, Wilemon abandons these allegations of affirmative fraud.

[25]Fraud by nondisclosure and fraudulent inducement are subspecies of fraud. *See Hassell Constr. Co. Inc. ex rel. Hassell v. Springwoods Realty Co.*, No. 01-17-00822-CV, 2023 WL 2377488, at *19 (Tex. App.—Houston [1st Dist.] Mar. 7, 2023, pet. denied) (mem. op.).  Wilemon pleaded both under the "fraudulent inducement" label, seeking to recover for Brownlie's "material misrepresentations and/or concealment of material facts."  And when Brownlie challenged the fraudulent inducement claim in his no-evidence summary judgment motion, Wilemon responded by asserting that Brownlie had fraudulently induced him into agreeing to the Transaction both through affirmative statements and through his failure to disclose material information.  Yet, on appeal, Wilemon asserts that his claim for fraud by nondisclosure was distinct from his claim for fraudulent inducement, and he argues that Brownlie's no-evidence summary judgment motion challenged the latter but not the former.  Given that Wilemon's pleadings and summary judgment response framed his nondisclosure claim as a component of his fraudulent inducement claim, Brownlie's no-evidence attack on the overall fraudulent inducement claim was sufficient to encompass Wilemon's allegations of fraud by nondisclosure.

[26]To support his quasi-contract claim, Wilemon relied upon the same factual allegations of fraud that he relied upon for his other fraud-based claims:  he pleaded that the Transaction was the result of a "fraudulent scheme concocted by Brownlie," that "Wilemon . . . would never have agreed to the . . . Transaction had . . . he received the spreadsheet," and that allowing Brownlie to retain the Remaining Debt as

nondisclosure of material facts, and Brownlie's summary judgment motion asserted that there was no evidence of this premise. *Cf.* Tex. Gov't Code Ann. § 4001.058(a)(3) (defining "fraud" and "fraudulent practice" to include "an intentional failure to disclose a material fact");[27] *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019) (listing elements of fraud by nondisclosure, including that "the defendant deliberately failed to disclose material facts"); *Hubbard*, 138 S.W.3d at 487 (explaining that the equitable doctrine of quasi-contract "allow[s] for recovery of damages to prevent a party from obtaining a benefit from another by fraud, duress, unjust enrichment, or because of an undue advantage").

---

a "benefit from his fraudulent scheme" would be "unjust." *See Hubbard v. Shankle*, 138 S.W.3d 474, 487 (Tex. App.—Fort Worth 2004, pet. denied) (affirming no-evidence summary judgment on quasi-contract claim when court had already affirmed summary judgment on fraud claim and appellant relied on same fraud-based factual allegations).

[27]In the trial court, Wilemon supported his Securities Act claim by referencing two different statutory definitions of "fraud" and "fraudulent practice." In addition to alleging that Brownlie had "fail[ed] to disclose a material fact," Wilemon alleged fraud based on Brownlie's receiving an unconscionable gain through "the sale of a security, of an underwriting or promotion fee or profit, or of a selling or managing commission or profit." *See* Tex. Gov't Code Ann. § 4001.058(a)(3), (4). But Wilemon offered no evidence that the Transaction qualified as "the sale of a security, of an underwriting or promotion fee or profit, or of a selling or managing commission or profit." *See id.* § 4001.058(a)(4). And Wilemon repeats this error on appeal; he invokes the alternative definition of fraud but fails to explain how the Transaction fit within the definition.

On appeal, Wilemon argues that he produced probative evidence of four undisclosed material facts: the spreadsheet,[28] the values attributed to the Unwanted Entities in the spreadsheet, the allegedly inaccurate nature of those values, and the Transaction's effective forgiveness of the Remaining Debt. But Wilemon offered no evidence that these facts were material. To the contrary, his own deposition testimony indicated that they were not.

Although Wilemon's pleadings asserted that Brownlie had transferred the Unwanted Entities' shares "without regard to their actual value or suitability," in his deposition, Wilemon clarified that his complaint centered on the investments' "suitability" rather than their value. Wilemon explained that, from his perspective, Brownlie, "as [Wilemon's] financial advisor," should not have recommended dedicating a significant portion of Wilemon's investment portfolio to "one investment that ha[d] not produced a penny of revenue in 12 years." He candidly admitted that he had "signed all of the legal papers that specified that these interests were being transferred to [him]," but he claimed that Brownlie should have given him the "worksheet that very clearly showed what he was doing"—not what Brownlie was doing "in terms of allocating values to the assets" but "[w]hat he was doing as far as

---

[28]Although Wileman lists the spreadsheet itself as an undisclosed fact, the spreadsheet is a document rather than a fact. We thus construe Wilemon's reliance on the spreadsheet as a reiteration of his argument that specific facts shown on that spreadsheet—the Unwanted Entities' values and the Remaining Debt's forgiveness—were not disclosed.

transferr[ing the Unwanted Entities' shares] to pay off the money that he owed [Wilemon]."

Consistent with this, Wilemon recalled having asked Brownlie to "unwind" the Transaction as soon as he became aware of the Unwanted Entities' involvement—which, by Wilemon's own account, was months before he saw the spreadsheet. Wilemon's testimony thus showed that (1) it was not the values given to the Unwanted Entities' shares that Wilemon considered material but the fact that they were transferred to him at all, and (2) the fact of the transfer had been fully disclosed to Wilemon in the Transaction documentation. So rather than raising a fact issue on his pleaded fraud-based claims, Wilemon's evidence weighed against them by calling into question whether the allegedly undisclosed valuations were material.

The same was true for Wilemon's allegations of fraud based on Brownlie's failure to disclose the Remaining Debt's forgiveness; Wilemon offered no evidence that this was material, and his own evidence indicated that it was not. To reiterate, Wilemon asked Brownlie to "unwind" the Transaction months before he saw the spreadsheet and learned of the Remaining Debt's existence. At no point in Wilemon's deposition did he describe the Remaining Debt's involvement or forgiveness as material to his approval of the Transaction.

Wilemon's summary judgment evidence called into question whether he understood the Transaction to have forgiven the Remaining Debt at all. Wilemon averred that the Remaining Debt was "due to [him] after the [Transaction]," and his

expert described Brownlie as having "promise[d] to pay" the amount as part of the Transaction. But tricking someone into forgiving a debt by failing to disclose it—the scenario alleged in Wilemon's pleadings—is not the same thing as renewing a promise to pay an outstanding debt—the scenario described in Wilemon's summary judgment evidence.

Either way, Wilemon did not produce more than a scintilla of probative evidence that the facts Brownlie allegedly failed to disclose were material. We overrule Wilemon's challenges to the dismissal of his fraud-based claims.[29]

## IV. Conclusion

Because Wilemon failed to produce more than a scintilla of evidence of his claims, we affirm the trial court's summary judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: October 30, 2025

---

[29]When the trial court granted summary judgment on Wilemon's fraud-based claims, it also dismissed Wilemon's request for punitive damages. Wilemon asserts that this dismissal was erroneous because Brownlie's summary judgment motion did not address the possibility of Wilemon's recovering punitive damages for gross negligence or malice as opposed to fraud. But Wilemon did not plead a separate claim based on gross negligence or malice, and punitive damages are not a standalone claim. *See Lyden v. Aldridge*, No. 02-23-00227-CV, 2023 WL 6631528, at *3 n.4 (Tex. App.—Fort Worth Oct. 12, 2023, no pet.) (mem. op.) (clarifying that "there is no independent cause of action for exemplary damages" and such damages are instead "an element of damages recoverable under a cause of action").